UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

ANTHONY JOSEPH,                          26-cv-2979 (JGK)

                    Petitioner,          MEMORANDUM OPINION
                                         AND ORDER
          - against -

PAUL ARTETA, ET AL.,

                    Respondents.

———————————————————————

JOHN G. KOELTL, District Judge:

The petitioner, Anthony Joseph, is a lawful permanent resident and national of Trinidad and Tobago who was detained when attempting to reenter the United States after a six-week trip abroad. Joseph seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on the ground that his ongoing detention by Immigration and Customs Enforcement ("ICE") is unlawful. Pet. Writ of Habeas Corpus ("Pet."), ECF No. 1. Although Joseph acknowledges that his detention is statutorily mandated by either 8 U.S.C. § 1225(b) or 8 U.S.C. § 1226(c), he argues that his more-than-five-month detention is unreasonably prolonged, and the Fifth Amendment's Due Process Clause thus entitles him to a bond hearing at which the Government must prove by clear and convincing evidence that he poses a risk of flight or a danger to the community. For the following reasons, Joseph's petition is **granted in part and denied in part.**

**I.**

**A.**

Joseph is a forty-four-year-old national of Trinidad and Tobago. Decl. of Anthony Sherwin Joseph Supp. Pet. Writ of Habeas Corpus ("Joseph Decl.") ¶ 1, ECF No. 1-2. On April 14, 2001, Joseph was admitted into the United States as a Lawful Permanent Resident ("LPR"). Id.; see also Decl. of Dmitry Rousseau ("Rousseau Decl.") ¶¶ 4-5, ECF No. 7. He has resided in the United States for twenty-five years.

On January 19, 2006, Joseph pleaded guilty in Kings County Criminal Court to Assault in the Third Degree with Intent to Cause Physical Injury in violation of New York Penal Law § 120.00(1). Rousseau Decl. ¶ 6. Joseph was sentenced on the same day to three years of probation. Id. More than a decade later, on October 9, 2019, Joseph was convicted after a jury trial in Queens County Supreme Court of Assault in the Second Degree with Causing Injury to a Person who is Sixty-Five Years of Age or Older while the Actor is More than Ten Years Younger, in violation of New York Penal Law § 120.05(12). Id. ¶ 8. In that same proceeding, Joseph was also convicted of Criminal Mischief with Intent to Damage Property in violation of New York Penal Law § 145.00(1). Id. On November 20, 2019, Joseph was sentenced to six months' imprisonment and five years of

probation. Id. ¶ 9. Joseph has not been arrested or charged with any crimes after his October 2019 conviction. Joseph Decl. ¶ 9.

**B.**

Joseph has a high-school-age daughter named A.J. who has lived with Joseph since 2021. Id. ¶ 10. The Bronx Family Court granted Joseph sole custody of A.J. in 2021 in response to a neglect petition filed by the Administration for Children's Services ("ACS") against A.J.'s mother. Id. The ACS petition alleged that A.J.'s mother physically abused and neglected A.J. Id.

While living with Joseph, A.J. attended therapy and excelled in school. Id. ¶ 11. A.J. aspires to be a doctor, and her professional mentor, Dr. Ameena Ali, believes that "Mr. Joseph's role as a supportive and engaged father has been central to [A.J.'s] development. He has consistently reinforced the importance of education, accountability, and long-term planning."[1] Pet. Writ of Habeas Corpus, Ex. F, Ltr. of Dr. Ameena Ali at 1, ECF No. 1-6. Dr. Ali describes Joseph's level of parental engagement, "particularly in cultivating [A.J.'s] confidence in the demanding medical field," as "impactful and uncommon." Id.

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

## C.

In October 2025, Joseph traveled to Trinidad and Tobago to visit his grandmother, whose health had been declining. Joseph Decl. ¶ 12. On November 20, 2025, Joseph returned to the United States, arriving at John F. Kennedy International Airport in Queens County, New York, as a passenger on JetBlue Airlines flight 1818 originating in Port of Spain, Trinidad. Rousseau Decl. ¶ 9. When Joseph arrived, he applied for admission into the United States as a returning LPR. Id. Joseph presented his Trinidadian passport and a valid I-551 to a Customs and Border Patrol ("CBP") officer. Id. ¶ 10. The CBP officer identified Joseph as an individual on a law-enforcement watch list due to his prior criminal convictions and escorted Joseph to a secondary screening area, where CBP officers conducted additional background checks. Id. ¶¶ 10-11.

After questioning Joseph and taking his statement regarding his past criminal convictions, the CBP officers determined that Joseph was inadmissible into the United States pursuant to INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), as an alien[2] convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude. Id. ¶ 11. The two

---

[2] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(3).

4

qualifying offenses were Joseph's 2006 conviction of third-degree assault and his 2019 conviction of second-degree assault. Id. Joseph was then personally served with a Notice to Appear ("NTA"). Id.; see also Return to Habeas Petition, Ex. A, Notice to Appear, ECF No. 9-1.

Joseph was not admitted into the United States. On November 22, 2025, he was transferred into ICE custody at JFK Airport pursuant to INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A). Later that day, Joseph was transferred to Orange County Jail. Rousseau Decl. ¶ 12; see also Return to Habeas Petition, Ex. B, Form I-213, Record of Deportable/Inadmissible Alien, ECF No. 9-2. He has remained at Orange County Jail since that date. Rousseau Decl. ¶ 12. On December 1, 2025, a CBP officer served Joseph with an amended NTA, which also charged him as inadmissible to the United States pursuant to INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I). Id. ¶ 13. The amended NTA provided a more complete recitation of Joseph's convictions. Rousseau Decl. ¶ 15.

### D.

On January 12, 2026, Joseph filed with the immigration court a Form EOIR-42a, Application for Cancellation of Removal for Certain Permanent Residents, pursuant to 8 U.S.C. § 1229b(a). Id. ¶ 18. Cancellation of removal is a form of

discretionary relief from removal. For those aliens who meet certain statutory eligibility requirements, "the Attorney General in his discretion [may] decide[] whether to grant or deny relief." Mendez v. Holder, 566 F.3d 316, 320 (2d Cir. 2009).

On March 3, 2026, the immigration court held a hearing on Joseph's Cancellation of Removal Application. Joseph Decl. ¶ 18. The immigration judge granted Joseph's application, acknowledging the important role he serves in his daughter's life. Id.; see also Pet. Writ of Habeas Corpus, Ex. A, Order of the Immigration Judge, ECF No. 1-1. On March 10, 2026, the Department of Homeland Security appealed the immigration judge's decision to the Board of Immigration Appeals. That appeal remains pending.

One month later, on April 10, 2026, Joseph filed this petition for a writ of habeas corpus, alleging that his detention violates the Due Process Clause of the Fifth Amendment. He requests immediate release, or, alternatively, a constitutionally adequate bond hearing. ECF No. 1.

**II.**

District courts have the authority pursuant to 28 U.S.C. § 2241 to issue a writ of habeas corpus to any petitioner "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The jurisdiction

conferred on federal courts by § 2441 includes the authority to review an alien's claims challenging the constitutionality of his or her detention. See Demore v. Kim, 538 U.S. 510, 517 (2003).

Section 1226(e) provides that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the ... denial of bond or parole." 8 U.S.C. § 1226(e). But "[t]he Supreme Court has made clear that § 1226(e) does not preclude challenges to the extent of the Government's detention authority under the statutory framework as a whole," "[n]or does it limit habeas jurisdiction over constitutional claims or questions of law." Velasco Lopez v. Decker, 978 F.3d 842, 850 (2d Cir. 2020).

## III.

The Government contends that Joseph is an arriving alien whose detention is governed by 8 U.S.C. § 1225(b)(2)(A). Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Under § 1225, an alien present in the United States who has not been admitted is known as an "applicant for admission." 8 U.S.C. § 1225(a)(1).

7

The term "admission" is defined in the INA to mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); see also 8 C.F.R. § 235.1 (enumerating inspection procedures). An alien is "seeking admission" within the meaning of § 1225(b) when that alien is requesting lawful entry into the United States after inspection and authorization. Cunha v. Freden, No. 25-3141-pr, 2026 WL 1146044, at *23 (2d Cir. Apr. 28, 2026).

Ordinarily, "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws." 8 U.S.C. § 1101(a)(13)(C). But the statute excepts from this general rule any LPR who "has committed an offense identified in section 1182(a)(2) of this title." 8 U.S.C. § 1101(a)(13)(C)(v). Section 1182(a)(2) in turn covers "criminal and related grounds," including "crime[s] involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A)(i)(I). Thus, "an arriving alien determined to be inadmissible based on a prior criminal conviction ... is regarded as seeking an admission and is therefore subject to § 1225(b)." Perez v. Aviles, 188 F. Supp. 3d 328, 332 (S.D.N.Y. 2016).

The Government also contends that Joseph's detention is mandatory pursuant to 8 U.S.C. § 1226(c), which provides that

8

the "Attorney General <u>shall</u> take into custody any alien who ... is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title." 8 U.S.C. § 1226(c)(1)(A) (emphasis added). According to the respondents, Joseph is charged as inadmissible under § 1182(a)(2)(A)(i)(I) based on his 2006 third-degree assault conviction and his 2019 second-degree assault conviction, which the Government contends qualify as crimes involving moral turpitude. <u>See</u> Rousseau Decl. ¶¶ 11, 17.

Joseph does not dispute that his detention is statutorily mandated under either § 1225(b) or § 1226(c). Instead, he contends that the Due Process Clause of the Fifth Amendment entitles him to a bond hearing under either statute because his detention has become unreasonably prolonged.

**A.**

The Due Process Clause of the Fifth Amendment forbids the Federal Government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." <u>Zadvydas v. Davis</u>, 533 U.S. 678, 690 (2001). That protection applies to "noncitizens, whether their presence here is lawful, unlawful, temporary, or perma-nent." <u>Velasco Lopez</u>, 978 F.3d at 850; <u>see also</u> <u>Reno v. Flores</u>,

9

507 U.S. 292, 306 (1993) ("[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

LPRs present inside the United States are entitled to even more robust constitutional protections than noncitizens without any legal status. "[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." Landon v. Plasencia, 459 U.S. 21, 32 (1982). Specifically, LPRs "become[] invested with the rights guaranteed by the Constitution to all people within our borders ... includ[ing] those protected by ... the Fifth Amendment[,]" which does not "acknowledge[] any distinction between citizens and resident aliens." Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n.5 (1953).

The Government acknowledges that Joseph is entitled to some due process protections. It insists, however, that "[t]he constitutional rights of arriving aliens who have not been admitted to the United States are limited." Mem. Opp'n Pet. Writ of Habeas Corpus ("Opp'n") 11, ECF No. 8. Although the Government does not attempt to define the outer boundaries of a returning LPR's due-process rights, the Government argues that "the procedure authorized by Congress under § 1225(b), § 1226(c), and related provisions" fall on the right side of the

10

line, and therefore "do not permit the possibility of a bond hearing." Id.

To support this claim, the Government relies primarily on Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953). In Mezei, the Supreme Court considered whether Mezei, an LPR who had traveled to Eastern Europe for approximately nineteen months during the Cold War, retained his due process rights when he attempted to return to the United States, or whether he should instead be treated for constitutional purposes as "an alien on the threshold of initial entry." Id. at 212. The Court held that it was the latter because Mezei "simply left the United States and remained behind the Iron Curtain for 19 months." Id. at 214. "In such circumstances," the Court had "no difficulty in holding respondent an entrant alien or assimilated to that status for constitutional purposes." Id. And "[t]hat being so, the Attorney General [could] lawfully exclude [Mezei] without a hearing." Id.

Only days before deciding Mezei, however, the Supreme Court held in Chew that "a Chinese Seaman ... admitted to permanent residence in the United States" who left the country on a four-month voyage retained his full constitutional rights when he sought reentry. 344 U.S. at 592-95. The Court "consider[ed] first what would have been [Chew's] constitutional right to a hearing had he not undertaken his voyage," and concluded that "a lawful permanent resident of the United States [who] remains

11

physically present there ... may not be deprived of his life, liberty or property without due process of law." Id. at 596. The Court then explained that Chew, despite his travel abroad, was entitled to those same constitutional protections. "For purposes of his constitutional right to due process," the Court "assimilate[d] [Chew's] status to that of an alien continuously residing and physically present in the United States." Id.

The Court again considered the process due to an LPR in Plasencia. In that case, the Supreme Court held that an LPR who left the United States for two days to smuggle aliens across the border was entitled to full due-process protections. Plasencia, 459 U.S. at 23, 33-34. The Court explained that Chew provides the general rule, not Mezei. Id. Chew stands for the proposition that "a resident alien returning from a brief trip has a right to due process just as would a continuously present resident alien." Id. at 31. Mezei "does not govern this case, for [the petitioner] was absent from the country only a few days." Id. at 34. The Court distinguished between an LPR who is absent from the United States only briefly — like those in Chew and Plasencia itself — and one, as in Mezei, whose "absence is extended" and thus "may lose his entitlement to" have his status assimilated "to that of an alien continuously residing and physically present in the United States." Id. at 33.

12

This case is far closer to Chew and Plasencia than to Mezei. Therefore, Joseph is entitled to the full due-process protections of the Fifth Amendment. "First, courts have refused to apply Mezei where, as here, the LPR's absence was brief." Arias v. Aviles, No. 15-cv-9249, 2016 WL 3906738, at *6 (S.D.N.Y. July 14, 2016). "Although the Supreme Court has not identified the length of absence that will diminish an LPR's rights, courts look to the naturalization laws to determine what would be a sufficient time abroad to divest the alien of his due process rights." Id. "In particular, courts rely on the amount of time that an applicant for citizenship can be absent without endangering his application — currently six months." Id. (citing 8 U.S.C. § 1427(a)). In this case, Joseph was absent for only six weeks.

Second, courts in this district have read Mezei to stand for the limited proposition that an LPR loses full due-process rights only when there exists "evidence of wil[l]ful abandonment of residency." Garcia v. United States, No. 96-cv-4061, 1996 WL 412018, at *3 (S.D.N.Y. July 22, 1996); see also Arias, 2016 WL 3906738, at *7 (same). Indeed, several courts have concluded that Mezei's holding turned on "[t]he not-so-veiled subtext of [the] majority opinion ... that Mezei had lost his entitlement to due process rights, not just because he had spent time abroad, but also because he had abandoned his residence in — and

13

possibly also his loyalty to — the United States by returning to Eastern Europe for over a year." St. John v. McElroy, No. 95-cv-9810, 1995 WL 753936, at *2 (S.D.N.Y. Dec. 19, 1995); see also Cruz-Taveras v. McElroy, No. 96-cv-5068, 1996 WL 455012, at *5 (S.D.N.Y. Aug. 13, 1996) ("Resident aliens in exclusion proceedings enjoy the same rights, because returning resident aliens are entitled to the same protections they enjoyed before they left, so long as they have not abandoned their United States residence."). The respondents point to no evidence in this case that Joseph intended to abandon his residency in the United States.

**B.**

Because Joseph is an LPR who was absent from the United States only briefly and expressed no intention of abandoning his residency in the United States, he is entitled to the full due-process protections of the Fifth Amendment. He is entitled to those process rights due to an LPR who has been continuously present in the United States and who is subject to mandatory detention under the immigration laws.

In Black v. Decker, the Court of Appeals for the Second Circuit held that among those rights is the right to a bond hearing when the alien's detention becomes unreasonably prolonged. 103 F.4th 133 (2d Cir. 2024). The statute at issue in Black was 8 U.S.C. § 1226(c), which the Government in this case

14

claims is one of the two statutory bases for Joseph's mandatory detention. Although that statute "makes no explicit provision for an initial or other bond hearing during the period of detention and places no limit on the duration of detention under its authority," the Court of Appeals concluded that "due process bars the Executive from detaining [aliens] for an unreasonably prolonged period under section 1226(c) without a bond hearing." Id. at 137, 143. The Court of Appeals rejected "a bright-line constitutional rule requiring a bond hearing after six months of detention — or after any fixed period of detention," but cautioned "that any immigration detention exceeding six months without a bond hearing raises serious due process concerns." Id. at 150.

In determining whether an alien subject to mandatory detention is entitled to a bond hearing, the Court of Appeals instructed district courts to evaluate the factors set forth in Mathews v. Eldridge, 424 U.S. 319 (1976): (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Black, 103 F.4th at 151.

The Government contends that Joseph is subject to mandatory detention under both § 1225(b) and § 1226(c). Although Black dealt with detention under § 1226(c), its reasoning applies with equal force to aliens detained under § 1225(b). "Just like felons subject to removal under § 1226(c), the only permissible purpose for the detention of individuals under § 1225(b)[] is to prevent against danger to the community or the risk of flight, which is precisely what a bond hearing would address." Al-Thuraya v. Warden, Orange Cnty. Corr. Facility, 809 F. Supp. 3d 135, 143 (S.D.N.Y. 2025) (collecting cases providing bond hearings to aliens detained pursuant to § 1225(b)). Joseph's detention without a bond hearing at this point is therefore lawful only if it withstands scrutiny under the Mathews balancing test.

At the first step of the Mathews test, the Court looks to "the private interest that will be affected by the official action." 424 U.S. at 335. In this case, as in Black, "the private interest affected by the official action is the most significant liberty interest there is — the interest in being free from imprisonment." 103 F.4th at 151. The Government acknowledges that Joseph has significant liberty interests at stake but argues that a bond hearing is unwarranted because Joseph has been detained for only five months. Opp'n 17. Although the Court of Appeals for the Second Circuit has explained

16

that "any immigration detention exceeding six months without a bond hearing raises serious due process concerns," it expressly "reject[ed] a bright-line constitutional rule." Black, 103 F.4th at 150. The ultimate question therefore is not whether Joseph's detention lasts some arbitrary amount of time — it is whether Joseph's private interests in liberty outweigh any Government interest in further detention.

It would be particularly inappropriate to impose a six-month arbitrary threshold in this case before the petitioner could raise any due-process challenge to his detention in the first instance. Joseph has already been detained for more than five months and will continue to be detained for a considerable period of time as a result of the Government's appeal of the immigration court's determination that Joseph should be granted cancellation of removal.

Joseph's liberty interest is not all that is at stake. His detention also affects his daughter, A.J., who, in Joseph's absence, must live with her mother, who was previously found to have physically and emotionally abused A.J. Given these circumstances, the first Mathews factor weighs strongly in Joseph's favor, even though he has been detained for less than six months. Courts in this district routinely grant bond hearings to noncitizens before the six-month mark when that noncitizen's private interests are especially strong. See, e.g.,

17

<u>Veletanga v. Noem</u>, No. 25-cv-9211, 2025 WL 3751865, at *4 (S.D.N.Y. Dec. 26, 2025) (applying <u>Mathews</u> test to order bond hearing even though the petitioner had been detained only three months); <u>Ruiz Varela v. Bondi</u>, No. 26-cv-779, 2026 WL 624396, at *1, *3 (S.D.N.Y. Mar. 4, 2026) (finding due process violation and ordering release where the petitioner was detained for two months); <u>Ventura v. Bondi</u>, No. 26-cv-568, 2026 WL 539879, at *1, *5 (S.D.N.Y. Feb. 26, 2026) (finding detention prolonged in violation of due process and ordering release where the petitioner had been detained for four months).

Next, the Court considers "the risk of an erroneous deprivation of [Joseph's private] interest[s] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." <u>Mathews</u>, 424 U.S. at 335. The Government acknowledges that "there are limited procedures available" here. Opp'n 17. In fact, there are none. The Government concedes that its "only available option for release of detainees under § 1226(c) is for witness protection purposes, which are inapplicable here." <u>Id.</u> at 17–18. The Government nevertheless insists that Joseph had some procedural safeguards because he was able to challenge "before the immigration court whether []his crimes were crimes involving moral turpitude." <u>Id.</u> at 18. But that argument confuses issues. The question is not whether Joseph was able to dispute the Government's grounds for

18

seeking to remove him; it is whether there are procedural safeguards in place to determine whether his detention has become unreasonably prolonged. Al-Thuraya, 809 F. Supp. 3d at 144–45 ("Under § 1225(b)(1)(B)(ii), there are no 'procedural safeguards' in place to determine whether Al-Thuraya's detention has become unreasonable."). "In the absence of any meaningful initial procedural safeguards," "almost any additional procedural safeguards at some point in the detention would add value. The most obvious of these ... would be an individualized bond hearing at which an [immigration judge] can consider the noncitizen's dangerousness and risk of flight." Black, 103 F.4th at 153. The second Mathews factor therefore favors Joseph.

Finally, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335. The Government claims that it has interests in "(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others." Opp'n 18. But the Government points to no evidence that Joseph is either a risk of flight or a danger to the community. Indeed, the immigration judge has already found that Joseph, despite his convictions of crimes involving moral turpitude, qualifies for

cancellation of removal — a fact that the Government all but ignores. In addition, a Family Court judge awarded Joseph custody of his child _after_ the previous convictions. If Joseph in fact poses either a risk of flight or a danger to the community, then the Government can prove it at a bond hearing, thereby vindicating its interest. If it cannot, then continuing to detain Joseph would not advance the Government's interest in any event.

The respondents also contend that Joseph's detention "furthers the Government's interest in preventing the entry of unwanted persons, which is at its zenith at the international border." Opp'n 18 (quoting Palma v. Arteta, No. 25-cv-9340, 2026 WL 697015, at *10 (S.D.N.Y. Mar. 12, 2026)). This argument, however, again confuses issues because a bond hearing does not affect the Government's determination of whether Joseph is admissible. Instead, it is merely "the kind of routine administrative hearing that comes up in most cases involving detained noncitizens." Al-Thuraya, 809 F. Supp. 3d at 145.

*    *    *

All three Mathews factors favor Joseph. He is therefore entitled to a bond hearing at which the Government bears the burden of proving by clear and convincing evidence that he is a risk of flight or a danger to the community. The immigration

20

judge must also consider alternatives to detention and Joseph's ability to pay in setting a bond amount.

## VI.

The Court has considered all the arguments raised by the parties. If any argument was not specifically addressed, it is either moot or without merit. For the foregoing reasons, the petition is **granted in part.** Within seven calendar days of this Memorandum Opinion and Order, the immigration court must either hold a bond hearing at which the Government bears the burden of proving by clear and convincing evidence that Joseph is a risk of flight or a danger to the community, or release Joseph.

In determining whether to grant bond, the immigration judge shall consider the availability of alternative conditions of release, and in determining the amount of any bond imposed, the immigration judge shall consider Joseph's ability to pay. The petition is **denied in part** to the extent Joseph seeks immediate release.

The Clerk is respectfully directed to close ECF No. 1 and to close this case.

**SO ORDERED.**

Dated:    **New York, New York**
          **April 30, 2026**

                                        _____
                                             **John G. Koeltl**
                                        **United States District Judge**

21